UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: GREG CANERDY                                   CASE NO. 05-15132-DWH

DON MONTGOMERY                                                    PLAINTIFF

VERSUS                                           ADV. PROC. NO. 05-1247-DWH

GREGORY CANERDY                                                   DEFENDANT

OPINION

On consideration before the court is the complaint filed by the plaintiff, Don Montgomery, ("Montgomery"), against the defendant/debtor, Gregory Canerdy, ("Canerdy"); an answer to said complaint having been filed by Canerdy; and the court, having heard and considered same, hereby finds as follows, to-wit:

I.

The court has jurisdiction of the parties to and the subject matter of this adversary proceeding pursuant to 28 U.S.C. §1334 and 28 U.S.C. 157. This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(I).

II.

As a result of an alleged assault perpetrated by Canerdy against Montgomery on December 22, 2003, Montgomery received a judgment by default in the Circuit Court of Tippah County, Mississippi, against Canerdy which was dated September 27, 2004. The total judgment awarded was $400,000.00, which represented actual damages in the sum of $200,000.00, and punitive damages in the sum of $200,000.00. As set forth in the recorded judgement, the Circuit

Court considered, through the presentation of evidence, the extent of Montgomery's damages based on his motion for a final judgment by default. On July 28, 2005, Canerdy filed a voluntary petition for relief pursuant to Chapter 7 of the Bankruptcy Code. Thereafter, Montgomery filed the above captioned adversary complaint asserting that the judgment debt should be excepted from Canerdy's discharge pursuant to §523(a)(6) of the Bankruptcy Code[1]. This section provides that a debt for a willful and malicious injury by the debtor to another entity is non-dischargeable.

III.

During the course of the adversary proceeding trial, the attorney representing Canerdy offered as an exhibit medical records from the Tippah County Hospital emergency room, which were certified as being true and correct. The court took under advisement a ruling as to the admissibility of these records pending a review of Rules 803(3) and 803(4), Federal Rules of Evidence. Following this review, the court is of the opinion that these medical records can be received in evidence as Defendant's Exhibit 1 for the purpose of corroborating Canerdy's visit to the emergency room on December 22, 2003, as well as, verifying the truthfulness of the statements that he made for the purposes of the medical diagnosis and treatment that he was seeking on that occasion.

IV.

At the trial of this proceeding, only two witnesses testified regarding the factual events of the assault - Montgomery and Canerdy. Needless to say, their respective versions were significantly different.

---

[1] Hereinafter all cited Code sections will be considered as sections of the United States Bankruptcy Code unless specifically noted otherwise.

2

Montgomery is employed as a meter reader for Tippah County Electric Power Association. At the time of the incident in question, Montgomery was 53 years of age and had been working as a meter reader for approximately 23 years. Having observed Montgomery's physical appearance at trial, the court would estimate that Montgomery is approximately five feet nine inches tall. The medical records that he introduced reflect that he weighs between 165 to 175 pounds.

Canerdy is employed as a truck driver. According to the medical records, which the court admitted into evidence as "Defendant's Exhibit 1," Canerdy was 37 years of age at the time of this incident. He weighed 250 pounds and was five feet ten and one-half inches in height. Without question, Canerdy was and still is a substantially larger and much younger man than Montgomery.

On December 22, 2003, Montgomery had come to Canerdy's property to read the electric meter. He parked his Tippah County Electric Power Association truck on the street and proceeded to the back of the residence where the meter was located. Canerdy owned a mixed breed dog which was chained to a cable apparatus in the backyard. This apparatus allowed the dog access to the backyard area behind the house, but, according to Canerdy, the dog could not reach the area where the electric meter was located. Montgomery was apparently able to read Canerdy's meter without difficulty. However, when he began to proceed to the adjoining residence, which was only a short distance away, the dog growled and ran toward Montgomery. Montgomery, fearing that he might be bitten, sprayed the dog with what he described as a mild pepper spray from approximately ten feet away. At that moment, Mrs. Canerdy came out of the house from the back door and inquired if Montgomery had sprayed the dog. Montgomery

3

acknowledged that he had indeed sprayed the dog and advised Mrs. Canerdy, that if she wanted to complain, that she should contact the Tippah County Electric Power Association. About this same time, Canerdy, who had been asleep on a couch inside the house, heard the conversation between his wife and Montgomery, came out of the house through the backdoor, and also asked whether Montgomery had sprayed the dog. Montgomery again acknowledged that he had sprayed the dog and, according to his testimony, turned and proceeded toward the neighboring residence.

As Montgomery turned away, he testified that he was then either shoved or struck in the back with a blow that was severe enough to cause him to fall to his hands and knees. He then said he saw something, which he could not identify, coming toward his face, which struck him on the right side of his face rendering him unconscious for five to ten seconds. He indicated that he felt like he was rolling over and over. When he regained consciousness, he stated that he was lying flat on his back and that Canerdy was standing over him with his fists clenched. Montgomery indicated that Canerdy then apologized to him and offered to assist him in getting to his feet. Montgomery indicated that he was still dazed and refused the offer of assistance. After a very short while, Montgomery was able to get to his feet. He walked back to his truck and called the Tippah County Electric Association offices. He related what had happened and requested that someone there call the police. However, either a neighbor or Mrs. Canerdy's uncle had already called the police, and they arrived on the scene a few minutes later. Canerdy was arrested and taken into custody.

During his testimony, Canerdy confirmed several of the relevant events. He indicated, however, that his difficulties had begun the night before when he had to be transported by his wife to the Tippah County Hospital emergency room. Canerdy stated that he had an upper respiratory infection, started coughing, and "blacked out" while eating dinner. He was treated at the emergency room and released. His medical records reflected that he complained of dizziness and shortness of breath, but the examination revealed no abnormalities. The head CT scan indicated that there was no definite sight of hemorrhage, mass, or mid-line shift identified. During his testimony, Canerdy said that he was at the emergency room until the early morning hours of December 22, 2003. However, the medical records revealed that he was actually discharged at 1915 hours p.m., which is 7:15 p.m.

Canerdy stated that he returned home and went to sleep on the couch. He was awakened the next morning when he heard the aforementioned exchange of words between his wife and Montgomery. He admitted confronting Montgomery, but stated that he shoved him from the front. Canerdy said that when Montgomery fell that he struck himself in the face with the hand held computer that he was using to read the electric meters. He acknowledged that he did stand over Montgomery after he had fallen, but quickly apologized and offered to assist him. Canerdy also related that Montgomery made threatening remarks to him and to his wife. However, the court, considering the respective in court demeanor of these parties, as well as, their physical disparities, seriously doubts the credibility of this testimony. Canerdy was aware that someone had called the police, but thought that it was perhaps his wife's uncle. Canerdy confirmed that he was arrested and taken into custody by the police.

Shortly after the incident, Montgomery executed an affidavit which led to Canerdy's criminal prosecution for simple assault. At his trial, Canerdy testified that he pled "no contest" to the charge and was fined. However, the abstract from the Municipal Court of Ripley, Mississippi, introduced into evidence as Plaintiff's Exhibit 4, indicated that Canerdy pled "guilty" to the crime of simple assault. While the significance of this plea is not extremely material, it reflects one of several inconsistencies in Canerdy's version of all these events.

Because Canerdy's recollection differs remarkably from Montgomery's, a thorough discussion of Montgomery's injuries is important. While the first blow that was struck to Montgomery's back was severe enough to knock him to his hands and knees, in the court's opinion, the second blow was much more devastating. Montgomery suffered a hairline fracture to his jaw and had two of his teeth cracked. He suffered a torn rotator cuff on his left shoulder and a ruptured disk in his cervical spine. He had to undergo dental surgery, shoulder surgery, and cervical spine surgery. As a consequence, he was treated by a dental surgeon, an orthopedic surgeon, and a neurosurgeon. A titanium plate was inserted in his neck. Montgomery had to go through extensive rehabilitation and therapy. In addition to the physical trauma, he experienced mental trauma and had to undergo psychiatric counseling. Montgomery experienced severe pain, as well as, limitations of motion. His total medical bills approximated $54,594.04, but, fortunately, were paid through his workers' compensation coverage. Montgomery was unable to return to work for a period of seven months, but his full regular salary was paid through the workers' compensation coverage as supplemented by Tippah County Electric Power Association. Montgomery, however, did loose approximately $5,000.00 in wages that he would have earned through his customary overtime.

6

The severity of Montgomery's injuries shatters the credibility of Canerdy's version of the assault. This conclusion is supported significantly by the fact that Canerdy, through his attorneys, posited a completely different version from his in court testimony in the pre-trial order that was entered on December 17, 2008. Canerdy's version at that iteration appears at paragraph 7.b. as follows:

> Defendant: On December 21, 2003, the Defendant was treated for stroke symptoms at the Tippah County Hospital. The Defendant reported to the Tippah County Hospital that he had blacked out. On the following day, the Plaintiff came on to his property to read his electric meter and sprayed the Defendant's dog with pepper spray and threatened the Defendant's wife. The Defendant, who was having the same symptoms from the day before, does not recall attacking the Plaintiff.

Clearly, Canerdy now recalls attacking Montgomery, just not in a vicious manner. The court does not doubt that Canerdy had physical problems the evening before December 22, 2003. However, he was treated, released, and no significant abnormalities were discovered. Canerdy, however, did not stay at the emergency room until the early morning hours of December 22, 2003. Indeed, contradicting his in court testimony, the medical records that he introduced show that he was released from the emergency room in the early evening.

Canerdy's story that Montgomery fractured his own jaw and cracked two teeth with his small hand held computer borders on the preposterous. Fortunately, Canerdy did not try to explain away how Montgomery ruptured a disk in his cervical spine and tore his rotator cuff. From the court's observation, Canerdy is a large, strong man who was capable of inflicting the injuries that Montgomery sustained. Montgomery's version of these events is by far the more credible. Canerdy became enraged over the pepper spraying of his dog, which was only a mild deterrent to prevent a potential dog bite. After he lost his temper, he perpetrated a willful and

malicious assault against Montgomery who was only attempting to perform his job. Evidencing the seriousness of what had occurred in Canerdy's backyard, someone, perhaps even the uncle of Canerdy's wife, or perhaps a neighbor, called the police even before persons at Tippah County Electric Power Association were notified of the incident.

The Circuit Court considered the damages sustained by Montgomery and made an appropriate award. The extent of the medical bills, rehabilitation and counseling bills, the time of lost work, as well as, the pain and suffering experienced by Montgomery justified the extent of this award.

V.

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt resulting from a willful and malicious injury caused by the debtor to another entity or to the property of another entity. The Fifth Circuit Court of Appeals articulated its standard for the application of §523(a)(6) in *Miller v. J.D. Abrams, Inc., (In re Miller)*, 156 F.3d 598 (5th Cir. 1998). The court concluded that an injury is "willful and malicious" where the debtor's conduct would cause injury according to an objective substantial certainty of harm standard or upon a showing that the debtor had a subjective motive to cause harm. *See also, Pharr v. Ford (In re Ford)*, 276 B.R. 561 (Bankr. N.D. Miss. 2001).

Some courts have taken a more narrow approach to excepting debts from discharge pursuant to §523(a)(6) than that adopted by the Fifth Circuit. These decisions essentially hold that for a debtor's conduct to bring a debt within the discharge exception for willful and malicious injury that the debtor must will or desire the harm, or believe that the injury is substantially certain to occur as a result of his behavior. *See, In re Markowitz,* 190 F.3d 455 (6th

Cir. 1999); *Carrillo v. Su (In re Su)*, 290 F.3d 1140 (9th Cir. 2002); and *Thiara v. Spycher Brothers (In re Thiara)*, 285 B.R. 420 (9th Cir. BAP 2002). These cases reject the objective substantial certainty of harm standard, adopted by the Fifth Circuit in *Miller*, in favor of a completely subjective standard which requires proof of the debtor's intent.

While this court is obviously compelled to follow the test set forth in the *Miller* opinion, it also firmly believes that the *Miller* test is much more reasonable and practical in determining whether conduct is willful and malicious. Regardless, under the factual circumstances present in this proceeding, Canerdy's conduct would be considered willful and malicious under either the *Miller* test or the test adopted by those courts that require proof of intent. Consequently, this court concludes that Canerdy's assault on Montgomery constitutes a violation of §523(a)(6) of the Bankruptcy Code. The judgement debt rendered by the Circuit Court of Tippah County, Mississippi, against Canerdy, dated September 27, 2004, is a non-dischargeable obligation in Canerdy's bankruptcy case.

A separate order, consistent with this opinion, will be entered contemporaneously herewith.

ORDERED and ADJUDGED this the 28th day of April, 2010.

DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE