UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: GREG CANERDY                                              CASE NO. 05-15132-DWH

DON MONTGOMERY                                                              PLAINTIFF

VERSUS                                                          ADV. PROC. NO. 05-1247-DWH

GREGORY CANERDY                                                             DEFENDANT

OPINION

On consideration before the court in the above captioned adversary proceeding is a motion for a new trial or a motion to reconsider filed by the defendant/debtor, Gregory Canerdy, ("Canerdy"); a response to said motion having been filed by the plaintiff, Don Montgomery, ("Montgomery"); and the court, having heard and considered same, hereby finds as follows, to-wit:

I.

JURISDICTION AND PROCEDURAL STATUS

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157. This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(I).

Following a trial on the merits of a complaint filed by Montgomery against Canerdy, an opinion and order were entered by the court on April 28, 2010, which held that a judgment rendered by the Circuit Court of Tippah County, Mississippi, ("Circuit Court"), against Canerdy, dated September 27, 2004, was a non-dischargeable debt in Canerdy's bankruptcy case. The

opinion and order are attached hereto and incorporated herein by reference. Canerdy's motion for a new trial and for reconsideration apply to this court's decision set forth in the opinion and order.

II.

FACTUAL HISTORY

The aforementioned judgment, which was entered by default in the Circuit Court, resulted from a complaint filed by Montgomery against Canerdy to redress an assault which inflicted serious personal injuries. The total judgement awarded was $400,000.00, which represented actual damages in the sum of $200,000.00, and punitive damages in the sum of $200,000.00. As set forth in the judgment, the Circuit Court considered, through the presentation of evidence, the extent of Montgomery's damages based on his motion for a final judgment by default.

Subsequent to the entry of the judgment, Canerdy filed a voluntary petition for relief pursuant to Chapter 7 of the Bankruptcy Code. Thereafter, Montgomery filed an adversary complaint asserting that the judgment debt should be excepted from Canerdy's discharge pursuant to §523(a)(6) of the Bankruptcy Code, which provides that a debt for a willful and malicious injury is a non-dischargeable indebtedness. After considering the presentation of extensive proof concerning the factual events underpinning the assault, as well as, the nature and significant extent of the damages suffered by Montgomery, this court concluded that the judgment debt rendered by the Circuit Court was non-dischargeable in Canerdy's bankruptcy case. The court's findings of fact and conclusions of law are set forth in the aforementioned opinion. The extent of the medical bills, rehabilitation and counseling bills, the time of lost work, as well as, the pain and suffering experienced by Montgomery justified the extent of the Circuit

2

Court's actual damage award. Canerdy's post-trial motion for a new trial and for reconsideration suggest that this court should have completely revisited the Circuit Court's awards for both actual and punitive damages. For the reasons which will be set forth hereinbelow, this court believes that it is precluded from "going behind" the state court judgment.

In the early stages of this adversary proceeding, this court was asked whether the state court judgment could be given preclusive effect as to Canerdy's willful and malicious conduct. Because the judgment was silent "on its face" and because there was no transcript reflecting the conclusions of the state court judge, this court indicated that there would have to be a trial to establish the nature of Canerdy's conduct. Both attorneys in this proceeding acknowledged that the state court judge had conducted a hearing prior to entering the judgment, but the only indication of the substantive nature of Canerdy's conduct was the award of punitive damages. There was language in the judgment that the state court had inquired into the matter and was fully advised in the premises, but nothing further.

The non-dischargeability complaint filed on behalf of Montgomery was very specific as to the relief that it was seeking. It recited in the penultimate paragraph that, "Plaintiff prays for Judgment that the indebtedness of Defendant to Plaintiff in the amount of $400,000.00 plus interest from September 27, 2004 be deemed non-dischargeable in bankruptcy pursuant to 11 U.S.C. §523(a)(6)...". The answer filed by Canerdy simply denied that Montgomery was entitled to relief. There was no affirmative defense pled that the actual damages were excessive or that the punitive damages violated §11-1-65, Miss. Code Ann.[1]

---

[1] Hereinafter, this section will be referred to as §11-1-65, or the punitive damages "cap" section.

3

The first time that §11-1-65, was raised by Canerdy was in his post-trial motion. It was not raised in any pleadings; it was not raised at the pre-trial conference, it was not raised at trial, and it was not mentioned in his attorney's closing argument. The court notes that there are two versions of this statute, the first became effective January 1, 2003, and the second, which lowered the threshold of a punitive damage award to 2% of a defendant's net worth, became effective September 1, 2004. Regardless of which version is applicable to this proceeding, the amount of punitive damages awarded by the Circuit Court very likely exceeds the statutory "cap." This court would hasten to add, however, that the state court judgment is final, and no appeal was taken to challenge its efficacy.

A pre-trial order was entered in this adversary proceeding on December 17, 2008. In the pre-trial order, the parties stipulated that the judgment by default was entered in the Circuit Court against the defendant (Canerdy) in favor of the plaintiff (Montgomery) in the amount of $200,000.00 actual and $200,000.00 punitive damages. The following were set forth as contested issues of fact, to-wit:

1. The underlying basis of said judgment was the vicious and malicious intentional assault of Plaintiff by Defendant resulting in serious and permanent injuries to Plaintiff.

2. The nature and extent of the injuries sustained by Plaintiff in the incident of December 22, 2003, and the amount of damages sustained as a result.

3. The nature and extent of the conduct of the Defendant in said incident and whether punitive damages are warranted and if so the amount thereof.

While paragraph no. 3 in the contested issues of fact perhaps should have been considered a "red flag," the primary focus of the trial was on the factual events that occurred on the day of the assault, as well as, on the seriousness of Montgomery's injuries. Prior to and even during the

trial, a significant question was whether Canerdy even recalled attacking Montgomery. (Canerdy's version of the factual events set forth in the pre-trial order indicated that he had a "black out" episode the previous evening and did not recall attacking Montgomery the following morning.) However, during his trial testimony, Canerdy clearly and candidly recalled attacking Montgomery, but just not in a vicious manner. Consequently, consistent with the complaint and Canerdy's answer, the court was concerned primarily as to whether Canerdy's conduct was willful and malicious, and, if so, whether that conduct precluded the discharge of the Circuit Court judgment indebtedness. The court had absolutely no intention of revisiting the damage awards that were included in the judgment.

### III.

### DISCUSSION

A.  **TARDINESS** - The first reason that precludes this court from "going behind" the Circuit Court Judgment:

The court is of the opinion that it is too late to challenge the appropriateness of the Circuit Court's awards of damages for the first time in a motion for a new trial or for reconsideration in a bankruptcy dischargeability proceeding. A similar issue was addressed in *In re Snelson*, 305 B.R. 255 (Bankr. N.D. Tex. 2003), where Judge Houser offered the following comments:

> The Court was surprised by the penalty argument made by the Debtor for the first time in his closing argument. It was obvious to the Court that Citicorp's counsel was equally surprised.
>
> The Debtor's conduct here is simply not permissible. Trial by ambush is inappropriate. A litigant cannot be silent in his pleadings, wait until the close of the evidence, and then dramatically unveil a new defense. As stated in *Glass Containers Corp. v. Miller Brewing Co.*, 643 F.2d 308 (5th Cir. 1981), "[a] litigant cannot strategically lie behind the log until after the trial and receipt of evidence [and] argument...before raising an issue not found in the pleadings nor included in the pretrial order and *then* raise *it when it is too*

5

*late for his opponent to do anything about it.* The manifest prejudice of such tactics would make a shambles of the efficacy of pretrial orders and a fair trial." *Id.* at 312 (*quoting Bettes v. Stonewall Ins. Co.*, 480 F.2d 92, 94 (5th Cir. 1973)) (emphasis added.)

*Id.* at 263-64.

As noted hereinabove, the judgment entered by the Circuit Court of Tippah County is final and was not appealed. Although §11-1-65 was relatively new "on the books" when the events pertinent to this proceeding unfolded, this court assumes with a reasonable degree of certainty that this statute was never raised in the Circuit Court proceeding. It is, therefore, the opinion of this court, considering also the *Rooker-Feldman* analysis which follows, that the question of whether damages were incorrectly assessed must be answered by the state court and not by this court after the trial has been concluded.

B. <u>*Rooker-Feldman* Doctrine</u> - The second reason that precludes this court from "going behind" the Circuit Court judgment:

The *Rooker-Feldman* doctrine provides that lower federal courts lack jurisdictional authority to sit in appellate review of state court decisions. The *Rooker-Feldman* doctrine derives its name from two United States Supreme Court cases, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), holding that the jurisdiction of the federal district courts is strictly original, and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), holding that federal district courts do not have the authority to review final state court judgments. (The gateway to bankruptcy court jurisdiction is through the federal district court.)

*See, United States v. Shepherd*, 23 F.3d 923 (5th Cir. 1994) and 28 U.S.C. §1257, which provides that federal appellate jurisdiction over state court decisions is vested almost exclusively

6

in the United States Supreme Court. *See also, In the Matter of Erlewine (Ingalls v. Erlewine)*, 349 F.3d 205 (5th Cir. 2003), and *In the Matter of Reitnauer (Reitnauer v. Texas Exotic Feline Foundation, Inc.)*, 152 F.3d 341 (5th Cir. 1998).

In the case of *United States v. Shepherd*, 23 F.3d 923 (5th Cir. 1994), the court offered the following comments, to-wit:

> The *Rooker/Feldman* doctrine holds that federal district courts lack jurisdiction to entertain collateral attacks on state judgments. A federal complainant cannot circumvent this jurisdictional limitation by asserting claims not raised in the state court proceedings or claims framed as original claims for relief. If the district court is confronted with issues that are "inextricably intertwined" with a state judgment, the court is "in essence being called upon to review the state-court decision," and the originality of the district court's jurisdiction precludes such a review.
>
> In this instance, the federal district court exercised jurisdiction over claims relating to the ownership of the Yoakum County property. Ultimately the court set aside and voided the state judgment insofar as it related to the FmHA's asserted interest in the property. In accordance with the plain dictates of the *Rooker/Feldman* doctrine, we hold that the district court had no jurisdiction to review or disturb the Yoakum County judgment. Therefore, the state court's conclusion that the FmHA's lien had been validly extinguished remains intact.
>
> The government argues that the state judgment is void and therefore subject to collateral attack. However, in Texas, when a collateral attack is made on a judgment, the error which is alleged to render the judgment void must appear on the face of the court record. Having reviewed the state court record, we conclude that it contains no error of the sort that would render the state judgment void.

*Id.* at 924-25.

In footnotes 3 through 5, the court in *Shepherd* recognized that only void judgments were subject to collateral attack under Texas law, citing *Browning v. Placke*, 698 S.W. 2d 362, 363 (Tex. 1985), *Martin v. Stein*, 649 S.W. 2d 342, 345 (Tex. App.-Fort Worth 1983, writ ref'd n.r.e.), and *E.D. Systems Corp. v. Southwestern Bell Tel.*, 674 F.2d 453, 457 (5th Cir. 1982). The

7

court enumerated four circumstances that would indicate that a judgment is void in Footnote 5, to-wit:

> In Texas, a judgment is void only if it is shown that the rendering court (1) lacked jurisdiction over the party or his property; (2) lacked jurisdiction over the subject matter of the suit; (3) lacked jurisdiction to enter the particular judgment rendered; or (4) lacked the capacity to act as a court. *Placke*, 698 S.W.2d at 363. Errors that do not relate to these jurisdictional deficiencies render a judgment merely voidable, and correction of such errors must occur, if at all, on direct attack. *Id.*

*Id.*

Texas law is consistent with Mississippi law as to when a judgment is void. In *Bryant, Inc. v. Walters*, 493 So.2d 933 (Miss. 1986), the Mississippi Supreme Court offered the following:

> In considering whether a judgment should be set aside because it is a nullity, there is no discretion in the trial court. If a judgment is void it must be vacated. On the other hand, a judgment which is not a nullity cannot be set aside on this ground. A judgment cannot be set aside simply because it is erroneous. *See*: *Gulf Coast Building & Supply Company v. Int'l Brotherhood of Electrical Workers, Local No. 480*, 460 F.2d 105 (C.A. 5th 1972); *Marshall v. Board of Education, Bergenfield, N.J.*, 575 F.2d 417, 422 (3rd Cir.N.J. 1978). A party seeking to set aside final judgment because it is "void" under Rule 60(b)(4) has the same burden as at common law when seeking to set aside a final judgment after adjournment of the term of court. We have held that if the judgment was void, it could be set aside, *Burns v. Delta Loans, Inc.*, 354 So.2d 268 (Miss. 1974); *Whiteway Finance Company v. Parker*, 226 So.2d 903 (Miss. 1969). If merely erroneous, however, it could not. *City of Starkville v. Thompson*, 260 So.2d 191 (Miss. 1972); *Bates v. Strickland*, 139 Miss. 636, 103 So. 432 (1925).
>
> We have said that if a court has jurisdiction of the subject matter and of the parties, and renders judgment during a term of court, it is without jurisdiction to set aside the judgment at a subsequent term. *Strain v. Gayden*, 197 Miss. 353, 20 So.2d 697 (1945). Federal courts interpreting this rule have stated that a judgment is void only if the court that had rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law. *See: Wright and Miller, Federal Practice and Procedure: Civil*, §2862, pp. 199-200.

*Bryant*, 493 So.2d at 937-38.

This reasoning leads this court to the inescapable conclusion that the Circuit Court judgment in this proceeding is not void.

This court is aware that the Fifth Circuit Court of Appeals has recognized that there are exceptions to the *Rooker-Feldman* doctrine. In *Richard v. Hoechst Celanese Chemical Group, Inc.*, 355 F.3d 345 (5th Cir. 2003), the court discussed these exceptions, to-wit:

> While we find this reasoning persuasive, we also recognize that the *Rooker-Feldman* doctrine only applies insofar as a state court judgment merits full faith and credit. *Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 373, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (stating that a federal court must give preclusive effect to a state court judgment only to the extent that the law of the state would give preclusive effect to the judgment); *In re Lease Oil Antitrust Litigation*, 200 F.3d 317, 319 N. 1, 320 (5th Cir. 2000) (noting that the *Rooker-Feldman* doctrine is consistent with the Full Faith and Credit Act, 28 U.S.C. §1783); *Gauthier v. Continental Diving Services*, 831 F.2d 559, 561 (5th Cir. 1987) (declining to apply the *Rooker-Feldman* doctrine because doing so would require the federal court to give greater deference to a state court judgment than that state's courts would give the judgment); *Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348 (7th Cir. 1996) (Easterbrook, J., dissenting on request for rehearing en banc). Federal jurisdiction is therefore proper under *Rooker-Feldman* if the state law does not provide preclusive effect to the state court judgment.

*Id.* at 350-51.

Another decision in the Fifth Circuit, *Liedtke v. State Bar of Texas*, 18 F.3d 315 (5th Cir. 1994), refused to find a due process exception to the *Rooker-Feldman* doctrine.

While the judgment entered by the Circuit Court in this proceeding appears to be inconsistent with the statutory provisions of §11-1-65, insofar as the award of punitive damages is concerned, the judgment is perfectly reasonable in its award of actual damages. Since the judgment would not be considered void under Mississippi law, it is not subject to collateral attack in this court. As such, the judgment may only be directly attacked in the state court proceeding in which it originated by a post-judgment motion or through an appeal. Because this

9

court cannot begin to predict the outcome of either, this court is unable to say that it is giving greater deference to the Circuit Court judgment than would be given by the state court, or that the judgment should not be accorded full faith and credit in this court. Succinctly stated, this court is of the opinion that Canerdy must first obtain relief, if indeed he can, from the Circuit Court judgment through a state trial or appellate court decision. If this can be accomplished, this court will concomitantly provide relief in the non-dischargeability proceeding consistent with any modification that may be made to the judgment through a state court proceeding. Until that time, the *Rooker-Feldman* doctrine precludes this court from "going behind" the state court judgment even though the punitive damages portion of the judgment appears to exceed the statutory limit.

Because of the foregoing analysis, this court is of the opinion that Canerdy's motion for a new trial or for reconsideration is not well taken. This decision will not prejudice Canerdy from seeking relief in state court by a post-judgment motion or an appeal. In the event that a modification is subsequently granted by the state trial court or an appellate court, this court will then, and only then, reconsider the question of damages. Otherwise, this court's decision as to the willful and malicious nature of Canerdy's conduct, as well as, the non-dischargeability of the Circuit Court judgment is final in all respects.

A separate order will be entered consistent with this opinion.

This the 6th day of July, 2010.

DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: GREG CANERDY                                    CASE NO. 05-15132-DWH

DON MONTGOMERY                                         PLAINTIFF

VERSUS                                                 ADV. PROC. NO. 05-1247-DWH

GREGORY CANERDY                                        DEFENDANT

OPINION

On consideration before the court is the complaint filed by the plaintiff, Don Montgomery, ("Montgomery"), against the defendant/debtor, Gregory Canerdy, ("Canerdy"); an answer to said complaint having been filed by Canerdy; and the court, having heard and considered same, hereby finds as follows, to-wit:

I.

The court has jurisdiction of the parties to and the subject matter of this adversary proceeding pursuant to 28 U.S.C. §1334 and 28 U.S.C. 157. This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(I).

II.

As a result of an alleged assault perpetrated by Canerdy against Montgomery on December 22, 2003, Montgomery received a judgment by default in the Circuit Court of Tippah County, Mississippi, against Canerdy which was dated September 27, 2004. The total judgment awarded was $400,000.00, which represented actual damages in the sum of $200,000.00, and punitive damages in the sum of $200,000.00. As set forth in the recorded judgement, the Circuit

Court considered, through the presentation of evidence, the extent of Montgomery's damages based on his motion for a final judgment by default. On July 28, 2005, Canerdy filed a voluntary petition for relief pursuant to Chapter 7 of the Bankruptcy Code. Thereafter, Montgomery filed the above captioned adversary complaint asserting that the judgment debt should be excepted from Canerdy's discharge pursuant to §523(a)(6) of the Bankruptcy Code[1]. This section provides that a debt for a willful and malicious injury by the debtor to another entity is non-dischargeable.

### III.

During the course of the adversary proceeding trial, the attorney representing Canerdy offered as an exhibit medical records from the Tippah County Hospital emergency room, which were certified as being true and correct. The court took under advisement a ruling as to the admissibility of these records pending a review of Rules 803(3) and 803(4), Federal Rules of Evidence. Following this review, the court is of the opinion that these medical records can be received in evidence as Defendant's Exhibit 1 for the purpose of corroborating Canerdy's visit to the emergency room on December 22, 2003, as well as, verifying the truthfulness of the statements that he made for the purposes of the medical diagnosis and treatment that he was seeking on that occasion.

### IV.

At the trial of this proceeding, only two witnesses testified regarding the factual events of the assault - Montgomery and Canerdy. Needless to say, their respective versions were significantly different.

---

[1] Hereinafter all cited Code sections will be considered as sections of the United States Bankruptcy Code unless specifically noted otherwise.

2

Montgomery is employed as a meter reader for Tippah County Electric Power Association. At the time of the incident in question, Montgomery was 53 years of age and had been working as a meter reader for approximately 23 years. Having observed Montgomery's physical appearance at trial, the court would estimate that Montgomery is approximately five feet nine inches tall. The medical records that he introduced reflect that he weighs between 165 to 175 pounds.

Canerdy is employed as a truck driver. According to the medical records, which the court admitted into evidence as "Defendant's Exhibit 1," Canerdy was 37 years of age at the time of this incident. He weighed 250 pounds and was five feet ten and one-half inches in height. Without question, Canerdy was and still is a substantially larger and much younger man than Montgomery.

On December 22, 2003, Montgomery had come to Canerdy's property to read the electric meter. He parked his Tippah County Electric Power Association truck on the street and proceeded to the back of the residence where the meter was located. Canerdy owned a mixed breed dog which was chained to a cable apparatus in the backyard. This apparatus allowed the dog access to the backyard area behind the house, but, according to Canerdy, the dog could not reach the area where the electric meter was located. Montgomery was apparently able to read Canerdy's meter without difficulty. However, when he began to proceed to the adjoining residence, which was only a short distance away, the dog growled and ran toward Montgomery. Montgomery, fearing that he might be bitten, sprayed the dog with what he described as a mild pepper spray from approximately ten feet away. At that moment, Mrs. Canerdy came out of the house from the back door and inquired if Montgomery had sprayed the dog. Montgomery

3

acknowledged that he had indeed sprayed the dog and advised Mrs. Canerdy, that if she wanted to complain, that she should contact the Tippah County Electric Power Association. About this same time, Canerdy, who had been asleep on a couch inside the house, heard the conversation between his wife and Montgomery, came out of the house through the backdoor, and also asked whether Montgomery had sprayed the dog. Montgomery again acknowledged that he had sprayed the dog and, according to his testimony, turned and proceeded toward the neighboring residence.

As Montgomery turned away, he testified that he was then either shoved or struck in the back with a blow that was severe enough to cause him to fall to his hands and knees. He then said he saw something, which he could not identify, coming toward his face, which struck him on the right side of his face rendering him unconscious for five to ten seconds. He indicated that he felt like he was rolling over and over. When he regained consciousness, he stated that he was lying flat on his back and that Canerdy was standing over him with his fists clenched. Montgomery indicated that Canerdy then apologized to him and offered to assist him in getting to his feet. Montgomery indicated that he was still dazed and refused the offer of assistance. After a very short while, Montgomery was able to get to his feet. He walked back to his truck and called the Tippah County Electric Association offices. He related what had happened and requested that someone there call the police. However, either a neighbor or Mrs. Canerdy's uncle had already called the police, and they arrived on the scene a few minutes later. Canerdy was arrested and taken into custody.

During his testimony, Canerdy confirmed several of the relevant events. He indicated, however, that his difficulties had begun the night before when he had to be transported by his wife to the Tippah County Hospital emergency room. Canerdy stated that he had an upper respiratory infection, started coughing, and "blacked out" while eating dinner. He was treated at the emergency room and released. His medical records reflected that he complained of dizziness and shortness of breath, but the examination revealed no abnormalities. The head CT scan indicated that there was no definite sight of hemorrhage, mass, or mid-line shift identified. During his testimony, Canerdy said that he was at the emergency room until the early morning hours of December 22, 2003. However, the medical records revealed that he was actually discharged at 1915 hours p.m., which is 7:15 p.m.

Canerdy stated that he returned home and went to sleep on the couch. He was awakened the next morning when he heard the aforementioned exchange of words between his wife and Montgomery. He admitted confronting Montgomery, but stated that he shoved him from the front. Canerdy said that when Montgomery fell that he struck himself in the face with the hand held computer that he was using to read the electric meters. He acknowledged that he did stand over Montgomery after he had fallen, but quickly apologized and offered to assist him. Canerdy also related that Montgomery made threatening remarks to him and to his wife. However, the court, considering the respective in court demeanor of these parties, as well as, their physical disparities, seriously doubts the credibility of this testimony. Canerdy was aware that someone had called the police, but thought that it was perhaps his wife's uncle. Canerdy confirmed that he was arrested and taken into custody by the police.

5

Shortly after the incident, Montgomery executed an affidavit which led to Canerdy's criminal prosecution for simple assault. At his trial, Canerdy testified that he pled "no contest" to the charge and was fined. However, the abstract from the Municipal Court of Ripley, Mississippi, introduced into evidence as Plaintiff's Exhibit 4, indicated that Canerdy pled "guilty" to the crime of simple assault. While the significance of this plea is not extremely material, it reflects one of several inconsistencies in Canerdy's version of all these events.

Because Canerdy's recollection differs remarkably from Montgomery's, a thorough discussion of Montgomery's injuries is important. While the first blow that was struck to Montgomery's back was severe enough to knock him to his hands and knees, in the court's opinion, the second blow was much more devastating. Montgomery suffered a hairline fracture to his jaw and had two of his teeth cracked. He suffered a torn rotator cuff on his left shoulder and a ruptured disk in his cervical spine. He had to undergo dental surgery, shoulder surgery, and cervical spine surgery. As a consequence, he was treated by a dental surgeon, an orthopedic surgeon, and a neurosurgeon. A titanium plate was inserted in his neck. Montgomery had to go through extensive rehabilitation and therapy. In addition to the physical trauma, he experienced mental trauma and had to undergo psychiatric counseling. Montgomery experienced severe pain, as well as, limitations of motion. His total medical bills approximated $54,594.04, but, fortunately, were paid through his workers' compensation coverage. Montgomery was unable to return to work for a period of seven months, but his full regular salary was paid through the workers' compensation coverage as supplemented by Tippah County Electric Power Association. Montgomery, however, did loose approximately $5,000.00 in wages that he would have earned through his customary overtime.

The severity of Montgomery's injuries shatters the credibility of Canerdy's version of the assault. This conclusion is supported significantly by the fact that Canerdy, through his attorneys, posited a completely different version from his in court testimony in the pre-trial order that was entered on December 17, 2008. Canerdy's version at that iteration appears at paragraph 7.b. as follows:

> Defendant: On December 21, 2003, the Defendant was treated for stroke symptoms at the Tippah County Hospital. The Defendant reported to the Tippah County Hospital that he had blacked out. On the following day, the Plaintiff came on to his property to read his electric meter and sprayed the Defendant's dog with pepper spray and threatened the Defendant's wife. The Defendant, who was having the same symptoms from the day before, does not recall attacking the Plaintiff.

Clearly, Canerdy now recalls attacking Montgomery, just not in a vicious manner. The court does not doubt that Canerdy had physical problems the evening before December 22, 2003. However, he was treated, released, and no significant abnormalities were discovered. Canerdy, however, did not stay at the emergency room until the early morning hours of December 22, 2003. Indeed, contradicting his in court testimony, the medical records that he introduced show that he was released from the emergency room in the early evening.

Canerdy's story that Montgomery fractured his own jaw and cracked two teeth with his small hand held computer borders on the preposterous. Fortunately, Canerdy did not try to explain away how Montgomery ruptured a disk in his cervical spine and tore his rotator cuff. From the court's observation, Canerdy is a large, strong man who was capable of inflicting the injuries that Montgomery sustained. Montgomery's version of these events is by far the more credible. Canerdy became enraged over the pepper spraying of his dog, which was only a mild deterrent to prevent a potential dog bite. After he lost his temper, he perpetrated a willful and

7

malicious assault against Montgomery who was only attempting to perform his job. Evidencing the seriousness of what had occurred in Canerdy's backyard, someone, perhaps even the uncle of Canerdy's wife, or perhaps a neighbor, called the police even before persons at Tippah County Electric Power Association were notified of the incident.

The Circuit Court considered the damages sustained by Montgomery and made an appropriate award. The extent of the medical bills, rehabilitation and counseling bills, the time of lost work, as well as, the pain and suffering experienced by Montgomery justified the extent of this award.

V.

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt resulting from a willful and malicious injury caused by the debtor to another entity or to the property of another entity. The Fifth Circuit Court of Appeals articulated its standard for the application of §523(a)(6) in *Miller v. J.D. Abrams, Inc., (In re Miller)*, 156 F.3d 598 (5th Cir. 1998). The court concluded that an injury is "willful and malicious" where the debtor's conduct would cause injury according to an objective substantial certainty of harm standard or upon a showing that the debtor had a subjective motive to cause harm. *See also, Pharr v. Ford (In re Ford)*, 276 B.R. 561 (Bankr. N.D. Miss. 2001).

Some courts have taken a more narrow approach to excepting debts from discharge pursuant to §523(a)(6) than that adopted by the Fifth Circuit. These decisions essentially hold that for a debtor's conduct to bring a debt within the discharge exception for willful and malicious injury that the debtor must will or desire the harm, or believe that the injury is substantially certain to occur as a result of his behavior. *See, In re Markowitz*, 190 F.3d 455 (6th

8

Cir. 1999); *Carrillo v. Su (In re Su)*, 290 F.3d 1140 (9th Cir. 2002); and *Thiara v. Spycher Brothers (In re Thiara)*, 285 B.R. 420 (9th Cir. BAP 2002). These cases reject the objective substantial certainty of harm standard, adopted by the Fifth Circuit in *Miller*, in favor of a completely subjective standard which requires proof of the debtor's intent.

While this court is obviously compelled to follow the test set forth in the *Miller* opinion, it also firmly believes that the *Miller* test is much more reasonable and practical in determining whether conduct is willful and malicious. Regardless, under the factual circumstances present in this proceeding, Canerdy's conduct would be considered willful and malicious under either the *Miller* test or the test adopted by those courts that require proof of intent. Consequently, this court concludes that Canerdy's assault on Montgomery constitutes a violation of §523(a)(6) of the Bankruptcy Code. The judgement debt rendered by the Circuit Court of Tippah County, Mississippi, against Canerdy, dated September 27, 2004, is a non-dischargeable obligation in Canerdy's bankruptcy case.

A separate order, consistent with this opinion, will be entered contemporaneously herewith.

ORDERED and ADJUDGED this the 28th day of April, 2010.

DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE

9

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: GREG CANERDY                                     CASE NO. 05-15132-DWH

DON MONTGOMERY                                          PLAINTIFF

VERSUS                                                  ADV. PROC. NO. 05-1247-DWH

GREGORY CANERDY                                         DEFENDANT

## ORDER

Consistent with the opinion entered contemporaneously herewith, it is hereby ordered and adjudged as follows, to-wit:

The judgment rendered by the Circuit Court of Tippah County, Mississippi, in favor of the plaintiff, Don Montgomery, against the defendant, Gregory Canerdy, dated September 27, 2004, is a non-dischargeable debt in the above captioned bankruptcy case pursuant to §523(a)(6) of the U.S. Bankruptcy Code. Interest shall be permitted to accrue on said judgment from its date of entry, and execution for all of which may issue according to law.

ORDERED and ADJUDGED this the 28th day of April, 2010.

DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE